IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| DONNA MACIEL,<br><br>     Plaintiff,<br><br>vs.<br><br>THOMAS J. HASTINGS PROPERTIES, INC., THOMAS HASTINGS, MICHAEL JONES, HASTINGS COMPANIES LLC, and BACK RIVER PARK LLC,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    NO. _____ |

## COMPLAINT

1.     Plaintiff Donna Maciel, through undersigned counsel, respectfully submits this Complaint against Defendants Thomas J. Hastings Properties, Inc., Thomas Hastings, Michael Jones, Hastings Companies LLC, and Back River Park LLC for violations of the Fair Housing Act, 42 U.S.C. § 3604 *et seq.*; 42 U.S.C. § 1982; the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A; the Massachusetts Fair Housing Law, Mass. Gen. Laws ch. 151B, § 4; and other law as a result of their discriminatory conduct in preventing Ms. Maciel from purchasing an affordable housing unit at the BackRiver Townhomes development in Hingham, Massachusetts due to her race and the color of her skin.

2.     Defendants discriminated against Ms. Maciel in multiple ways.  They discouraged her from buying a home by emphasizing the "predominantly white" nature of Hingham and by falsely telling her that no affordable housing unit would be available for her to purchase.  They denied her the opportunity to purchase her preferred unit by selling it to a white woman who was five positions behind Ms. Maciel on the relevant housing lottery list, even though that woman was already under contract to purchase a different unit at the development.  Defendants then

impeded Ms. Maciel's ability to enter into a contract on a different unit by, among other things, refusing to allow her to read the contract and demanding that she enter into it on a Sunday, but refusing to take her calls until Monday.  Finally, Defendants prevented Ms. Maciel from closing on the property by changing the closing date against her wishes, failing to provide required information to her mortgage company, and refusing to grant even a one-day extension to remedy the consequences of their own failure (even though they had freely given multiple extensions to a similarly situated white purchaser).

3.      Defendants' unlawful and discriminatory conduct has caused Ms. Maciel emotional, psychological, and financial harm and deprived her of the fundamental right to purchase a home free of invidious discrimination.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367(a).

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the unlawful conduct occurred in Hingham, Massachusetts and because Defendants reside in Hingham, Massachusetts.

## PARTIES

6.      Plaintiff Donna Maciel resides in Natick, Massachusetts.  She is of Asian descent and has dark skin.

7.      Defendants Thomas J. Hastings Properties, Inc. ("Hastings Inc.") and Hastings Companies LLC ("Hastings Co.") are domiciled at 26 Summer Street in Hingham.  They are real estate development firms for the BackRiver Townhomes development ("the Development").

8.      Defendant Back River Park LLC ("BackRiver") is domiciled at 19 Backriver Road in Hingham.  It owns the Development, other than the units that have been sold to private individuals.

9.      On information and belief, Defendant Thomas Hastings is a resident of Hingham, Massachusetts.  He is the manager of BackRiver and the president of Hastings Co. and Hastings Inc. and has acted and continues to act as an agent of said companies.

10.      On information and belief, Defendant Michael Jones is a resident of Hingham, Massachusetts.  He has been and continues to be project manager for the Development.  He is an employee of BackRiver, Hastings Co., and/or Hastings Inc. and has acted and continues to act as an agent of said companies.

## FACTS

### Defendants' Initial Attempt to Steer Ms. Maciel Away from the Development

11.      The Development, which contains more than 40 units, is located near the Weymouth Back River and Beal Cove in Hingham.  Defendants market the Development as "Hingham's Most Prestigious Townhome Community."

12.      Ms. Maciel first encountered discrimination at the Development when she and her two daughters, then aged five and seventeen years old, attended a public showing of an available unit at the Development on or about March 29, 2009.  Ms. Maciel's daughters are of Asian, African-American, and Puerto Rican descent.

13.      As Ms. Maciel and her daughters walked around the unit, they overheard the sales agent, Chris Payne, discussing the property with other, white prospective buyers.  Ms. Payne was discussing the attractiveness and location of the unit.  Ms. Payne is an agent and employee of BackRiver.

3

14.     When Ms. Payne came over to talk to Ms. Maciel, rather than asking for questions or offering information on the unit's various amenities, Ms. Payne immediately announced that the unit cost 1.2 million dollars, clearly implying that the development was beyond Ms. Maciel's price range.  Neither Ms. Maciel nor her daughters had asked about the price of the unit.  In comparison, Ms. Payne did not volunteer the unit's price to the white prospective buyers touring the unit.

15.     Ms. Payne further told Ms. Maciel that Hingham was a "predominantly white" town and questioned whether she and her family would "feel comfortable" living there.

16.     Because of these discriminatory, offensive, and unjustified comments, Ms. Maciel and her daughters left with the clear understanding that their family was not welcome at the Development because of their race and the color of their skin.

**Ms. Maciel's Priority Under the Affordable Housing Lottery Process**

17.     Defendants continued their discriminatory conduct by denying Ms. Maciel the opportunity to purchase her preferred property at the Development, Unit D4.

18.     Pursuant to its development agreement with the town of Hingham, the Development was required to contain five affordable housing units.

19.     On or about May 6, 2009, Ms. Maciel participated in a lottery in an attempt to qualify to purchase one of the Development's affordable housing units.

20.     The lottery was conducted by an outside company, Stockard, Engler, and Bingham, LLC, which was retained by BackRiver, Hastings Co., and Hastings Inc. and operated under the supervision of BackRiver, Hastings Co., and Hastings Inc.

21.     Ms. Maciel was the first person to complete an application for the affordable housing lottery and was assigned Application Number 1.  Two lotteries were conducted, one including all of the applicants (the "Open List") and one including only "Local Preference"

4

applicants (the "Local List").  The Local List included applicants who resided in Hingham, worked in Hingham, or had children in the Hingham METCO program.  Ms. Maciel was not eligible for the Local List.

22.     When the lottery was first conducted, Ms. Maciel, who was Applicant Number 1, was fourth on the Open List, behind Applicants Number 11, Number 2, and Number 8.  *See* Exhibit A.

23.     On information and belief, Applicant Number 11 was immediately dropped to the bottom of the list as she was only conditionally eligible, moving Applicant Number 2 to the top of the Open List.  When Applicant Number 2 declined to buy the available unit, Unit D4, Applicant Number 8, a white woman, moved to the top of the Open List, with Ms. Maciel next in line.

24.     Under the lottery provisions, the top two households on the Open List would be invited to a showing of the two nearly completed affordable housing units.  Ms. Maciel was entitled to attend the showing of the nearly completed units because she was second on the Open List.

### Defendants' Continued Efforts to Discourage Ms. Maciel's Purchase

25.     On or about May 22, 2009, Defendant Michael Jones telephoned Ms. Maciel and invited her to view Unit D4.  Ms. Maciel is of British national origin and speaks with a strong British accent.  Throughout their telephone conversation, Mr. Jones expressed enthusiasm about Ms. Maciel's potential purchase of a unit and advised her to be ready to sign a Purchase and Sale Agreement ("P&S") as soon as one of the units became available.

26.     On May 26, 2009, Ms. Maciel went to the Development for the showing and met Defendant Jones in person for the first time.  Mr. Jones was visibly shocked by Ms. Maciel's appearance.

5

27.     Ms. Maciel toured Unit D4 with Defendant Jones and told him that she was interested in purchasing that unit.  Mr. Jones told her that even though she was next in line for Unit D4 after Applicant Number 8, it was unlikely that it would become available for Ms. Maciel because Applicant Number 8 was very interested in the property.

28.     Ms. Maciel nevertheless expressed to Defendant Jones her strong interest in purchasing Unit D4.

29.     A few days later, Ms. Maciel called Defendant Jones, who told her that Applicant Number 8 had signed a P&S for Unit D4 and there were no more affordable housing units currently available.  He further stated, falsely, that another unit might not be available for ten years and might "never" be available if enough market rate units did not sell first.

30.     Based on this conversation with Defendant Jones, Ms. Maciel believed she would not be able to get an affordable housing unit at the Development and therefore signed a P&S with a separate development company for a different housing unit in Kingston, Massachusetts. In connection with this P&S, Ms. Maciel made a down payment in the amount of $2,877 (the "Kingston deposit").

### Defendants' Denial of Ms. Maciel's Opportunity to Purchase Unit D4

31.     Defendants continued their discriminatory conduct by improperly refusing to allow Ms. Maciel to purchase Unit D4.

32.     On or about June 16, 2009, Ms. Maciel was informed by Lottery Director Brian Engler that Applicant Number 8 had been unable to secure a mortgage commitment and that Unit D4 was available.

33.     At that time, Ms. Maciel's top position on the Open List entitled her to purchase Unit D4.

34.     Nevertheless, when Ms. Maciel went back to the Development to meet with Defendant Michael Jones on June 18, 2009, he told her that Unit D4 was no longer available and that Unit N21 was the only unit available to Ms. Maciel.

35.     Ms. Maciel had previously conveyed to Defendants her strong preference for Unit D4.  At 1,600 square feet in size, Unit D4 is approximately 236 square feet larger than Unit N21. Furthermore, while Unit N21 is located at the Development's edge, Unit D4 is centrally located and, in fact, was next door to a unit being used by Defendants as a development office.

36.     After further questioning by Ms. Maciel, Defendant Jones falsely stated that Unit N21 was the unit previously under agreement with Applicant Number 8 and that Unit D4 had never been an option.  Mr. Jones made this statement even though Unit D4 was the unit that he showed to Ms. Maciel on May 26, 2009.

37.     In fact, Defendants manipulated the affordable housing lottery to deny Ms. Maciel the ability to purchase Unit D4, instead offering that unit to Lottery Applicant Number 6, a white woman who already under contract to purchase a _different_ unit at the Development, Unit N21. This applicant had been able to sign a P&S for Unit N21 because of her position on the Local List, but she was five positions _behind_ Ms. Maciel on the Open List at the time Unit D4 became available for purchase.

38.     Instead of offering Unit D4 to Ms. Maciel when it became available, Defendants contacted Applicant Number 6 and offered her the opportunity to cancel her existing P&S for Unit N21 and sign a new P&S for Unit D4.  Defendants also offered Applicant Number 6 an extension of her financial contingency and closing date.  Applicant Number 6 took this opportunity and signed a new P&S for Unit D4.

39.     Neither the lottery process nor the applicable Department of Housing and Community Development (DHCD) regulations authorized Defendants to give an individual on the Local List priority over an individual on the Open List.

40.     To the contrary, DHCD regulations establish that local housing preferences must be implemented in a manner that avoids "potential discriminatory effects" and specifically require that local preference pools be accompanied by open applicant pools so that local preferences do not disproportionately delay or otherwise deny admission of non-local residents like Ms. Maciel who are protected under state and federal civil rights laws.

41.     Nor do Defendants have a policy or practice of allowing its customers to terminate existing contracts and enter into new contracts whenever a new, more attractive unit becomes available.

42.     Defendants took these extraordinary measures in a deliberate and discriminatory effort to deny Ms. Maciel the opportunity to purchase the unit she wanted.

**Defendants' Attempt to Impede a P&S on Unit N21**

43.     Even though Ms. Maciel was confused and upset by Defendants' refusal to allow her to purchase Unit D4, she proceeded with her attempt to purchase Unit N21 – the only unit available to her, according to Defendants.   Nevertheless, Defendants' obstructive and discriminatory conduct continued and nearly derailed Ms. Maciel's ability to execute a P&S on that unit as well.

44.     Defendants' P&S Notification "On the Clock" Letter ("On the Clock Letter") dated June 18, 2009, listed Monday, June 29, 2009, as the deadline by which Ms. Maciel must sign the P&S for Unit N21.  Correspondence from Lottery Director Brian Engler further stated

that Ms. Maciel had until "the end of the day on Monday," June 29, 2009, to sign the P&S.  Ms. Maciel returned to the Development to sign the P&S for Unit N21 on Friday, June 26, 2009.

45.     Defendant Jones first attempted to prevent Ms. Maciel from purchasing Unit N21 by, on June 26, 2009, claiming that she had to first obtain a written confirmation release from her P&S with the Kingston development.  On information and belief, a written confirmation release is not usually required to prove a release from a P&S agreement.

46.     Ms. Maciel told Defendant Jones on June 26, 2009 (a Friday) that since the officers for the Kingston development did not work on the weekends, Kingston would not be able to provide her with a written release until Monday morning.  Defendant Jones thereafter insisted that Ms. Maciel had only until 11:59 p.m. of June 28 (Sunday) to sign the P&S for Unit N21 – even though the On the Clock Letter clearly allowed her until June 29 (Monday).

47.     Even though it is customary for real estate buyers (and their attorneys) to review contracts in advance of signing them, when Ms. Maciel asked Defendant Jones on Friday, June 26, 2009, for a copy of the P&S so that she could review it over the weekend, he refused to provide his copy or make another copy for her review.

48.     Even though Defendant Jones told Ms. Maciel on Friday, June 26 that he would be available to answer any questions over the weekend, he responded to her call the next day with the following message:  "It's Saturday, my day off.  Please don't call my phone again . . . until Monday morning, anytime after 6 AM.  Thank you."  Mr. Jones thus insisted on a response from Ms. Maciel on the P&S by the end of Sunday but refused to receive her calls until Monday morning.

49.     On or about June 27, 2009, Ms. Maciel sent e-mails to both Brian Engler and Defendant Jones stating that she believed she was being discriminated against by Defendant Jones.

50.     Ms. Maciel ultimately obtained the written release demanded by Defendant Jones from the Kingston development on June 29, 2009, which cost Ms. Maciel the Kingston deposit of $2,877.

51.     Ms. Maciel signed a P&S with BackRiver for Unit N21 on June 29, 2009.

**Defendants' Attempt to Impose an Unworkable Closing Date on Unit N21**

52.     Defendants' bad-faith and discriminatory conduct continued in the closing process.  Even though Ms. Maciel was qualified, ready, willing, and able to buy Unit N21, Defendants impeded her efforts to close the sale and refused to offer her the same terms and conditions of sale as to persons outside of her protected class.

53.     The June 29, 2009 P&S stated that the closing date would be no later than Friday, September 4, 2009.  On July 27, 2009, Ms. Maciel sent Defendant Hastings an e-mail requesting that the closing date be scheduled for August 27, 2009 in order to avoid paying an additional month of rent for September.  That same day, Mr. Hastings refused, stating in an email message that the unit would not be done by August 27, 2009 and that "we may need to push" even the September 4 date "back."

54.     Based on Defendant Hastings's message, Ms. Maciel proceeded to make arrangements for a September 4 or later closing.  Then, in an about-face on July 31, 2009, Mr. Hastings sent another e-mail to Ms. Maciel telling her to expect August 27, 2009 to be the closing date.  In response, Ms. Maciel explained that she had already made arrangements for a September 4 closing due to Mr. Hastings' earlier message and requested a return to that date.

Mr. Hastings refused.  An attorney for Ms. Maciel's closing bank, Bank of America, also

contacted Mr. Hastings, stating that the parties would not be able to close unless the September 4

date was restored.  Again, Mr. Hastings refused.

55.     Only after Ms. Maciel complained about the closing date issue to DHCD, and

DHCD contacted Defendants, did Defendant Hastings agree to honor the original closing date of

September 4, 2009.

### Defendants' Failure to Provide Necessary Information for the Closing

56.     On or about July 6, 2009, Bank of America approved Ms. Maciel's Real Estate

Loan Application.  Shortly thereafter, it sent Defendants a request for various documents,

including a master insurance policy, title, development budget, and completed Condominium

Homeowners Association Certification ("Condo Questionnaire").  At the end of July 2009, the

bank's loan officer left a voicemail on Defendant Hastings' answering machine requesting a

return call.  On August 11, 2009, Ms. Maciel emailed Mr. Hastings to ask why Defendants had

not responded to Bank of America's inquiries.

57.     Defendants finally returned the Condo Questionnaire to Bank of America on

August 14, 2009, but failed to provide the required information in a complete and accurate

manner.  The Condo Questionnaire did not provide the number of phases in the project or the

number of units to be built in each phase of the project, and it incorrectly stated the number of

units already completed.

58.     On September 3, 2009, the loan officer at Bank of America notified Defendants of

these inaccuracies and omissions and requested a corrected Condo Questionnaire.  Defendants'

closing attorney then sent in the missing information on the number of phases and the number of

units within each phase, but did not correct the inaccurate information regarding the number of

units already completed.  This failure prevented Bank of America from approving the closing package.

59.     Had Defendants correctly completed the Condo Questionnaire, Bank of America could have processed the final closing documents by September 4, 2009.

### Defendants' Refusal to Grant Any Extension to Remedy Their Own Failure

60.     Even though the only impediment to Ms. Maciel's successful purchase of Unit N21 at the scheduled closing date and time was the lack of a fully complete and accurate Condo Questionnaire from Defendants, Defendants refused to grant Ms. Maciel a modest extension of time – even a single business day – to remedy their failure.

61.     Defendants initially acknowledged the reasonableness of a short extension.  At 9:57 a.m. on September 4, 2009, Defendants' closing attorney proposed extending the deadline until the next business day (September 8, 2009) and asked Ms. Maciel to cover carrying costs until that time.

62.     Less than thirty minutes later, Defendants' attorney told Ms. Maciel by email that she was being held in default for failing to close.  Defendants refused to grant even an extension of a few hours and declared Ms. Maciel to be in default by 10:26 a.m. – a mere 26 minutes past her scheduled closing time.

63.     On the next business day, Tuesday, September 8, 2009, Bank of America again contacted Defendants to try to get the corrected forms and process the closing package. Defendants refused and stated that they had already moved on to the next applicant.  On the afternoon of September 8, 2009, Defendants signed a P&S for Unit N21 with the next applicant on the Open List.  On information and belief, the closing for Unit N21 was completed in October 2009.

64.     Defendants' harsh and unjustified treatment of Ms. Maciel stands in sharp contrast to the accommodating manner in which they treated a similarly-situated white purchaser.  Even though Defendants refused to grant Ms. Maciel even a modest extension of time on her closing – in response to a problem for which they themselves bore direct responsibility – they granted multiple loan commitment and closing date extensions to Applicant Number 6, the white lottery applicant who purchased Unit D4.  The extensions were made in part to accommodate Applicant Number 6's difficulties in finalizing her financing.

**Injuries**

65.     The conduct of Defendants described herein was intentional, willful, and taken in disregard for the rights of Ms. Maciel and her family.

66.     As a result of Defendants' discriminatory conduct, Ms. Maciel has suffered injuries including extreme stress, humiliation, embarrassment, emotional distress, loss of deposits, lost down payment assistance, lost wages, lost money spent in preparation for move and reaction to default, lost property value, the costs and other harms resulting from last-minute changes to her children's school registrations, and deprivation of the right to equal housing opportunities regardless of race and skin color.

67.     On September 16, 2009, Ms. Maciel filed a Complaint with the Massachusetts Commission Against Discrimination ("MCAD"), alleging the discrimination described herein. The MCAD issued a Notice of Final Disposition on April 2, 2010 and upheld that determination on August 13, 2010.

## COUNT I

### VIOLATION OF FAIR HOUSING ACT
### 42 U.S.C. § 3604 *et seq.*
### (Against All Defendants)

68.     Plaintiff Maciel repeats and realleges Paragraphs 1 through 67 of this Complaint.

69.     Defendants violated the Fair Housing Act by:

   a.   Refusing to sell after making a bona fide offer, refusing to negotiate for a sale, or otherwise making unavailable or denying a dwelling to Ms. Maciel because of her race and skin color, in violation of 42 U.S.C. § 3604(a);

   b.   Discriminating against Ms. Maciel in the terms, conditions, or privileges of sale because of her race and skin color, in violation of 42 U.S.C. § 3604(b);

   c.   Making statements of preference or limitation on the basis of race and skin color in connection with the sale of dwellings, in violation of 42 U.S.C. § 3604(c);

   d.   Representing to Ms. Maciel, because of her race and skin color, that a dwelling was not available to her, when such dwelling was in fact so available, in violation of 42 U.S.C. § 3604(d); and

   e.   Discriminating against Ms. Maciel, because of her race and skin color, in the availability, terms, and conditions of a residential real estate-related transaction by persons and entities whose businesses include engaging in such transactions, in violation of 42 U.S.C. § 3605.

## COUNT II

### VIOLATION OF 42 U.S.C. § 1982
**(Against All Defendants)**

70.     Plaintiff Maciel repeats and realleges Paragraphs 1 through 67 of this Complaint.

71.     Defendants violated 42 U.S.C. § 1982 by denying Ms. Maciel the same right "as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property."

## COUNT III

### VIOLATION OF MASSACHUSETTS FAIR HOUSING LAW
**Mass. Gen. Laws ch. 151B, § 4**
**(Against All Defendants)**

72.     Plaintiff Maciel repeats and realleges Paragraphs 1 through 67 of this Complaint.

73.     Defendants violated Mass. Gen. Laws ch. 151B, § 4 by:

    a.   Refusing to sell or negotiate for sale and otherwise denying and withholding housing accommodations from Ms. Maciel because of her race and skin color;

    b.   Discriminating against Ms. Maciel, because of her race and skin color, in the terms, conditions, or privileges of housing accommodations or the acquisition thereof; and

    c.   Making statements of preference, limitation, or discrimination on the basis of race and skin color in connection with the sale of housing accommodations.

## COUNT IV

### VIOLATION OF MASSACHUSETTS EQUAL RIGHTS ACT
**Mass. Gen. Laws ch. 93, § 102**
**(Against All Defendants)**

74.     Plaintiff Maciel repeats and realleges Paragraphs 1 through 67 of this Complaint.

75.     Defendants violated Mass. Gen. Laws ch. 93 § 102 by denying Ms. Maciel the same rights enjoyed by white male citizens, to make and enforce contracts, and to purchase real property.

## COUNT V

### UNFAIR AND DECEPTIVE TRADE PRACTICES
### Mass. Gen. Laws ch. 93A
### (Against All Defendants)

76.     Plaintiff Maciel repeats and realleges Paragraphs 1 through 67 of this Complaint.

77.     Defendants' actions constitute unfair and deceptive acts or practices within the meaning of Mass. Gen. L. Ch. 93A, and were willful and knowing violations thereof.

78.     At the time that Defendants committed these unfair and deceptive acts and practices, they were engaged in the conduct of trade or commerce and acting in a business context within the meaning of Mass. Gen. L. Ch. 93A.

79.     The actions giving rise to these claims took place primarily and substantially in the Commonwealth of Massachusetts.

80.     Pursuant to Mass. Gen. Laws ch. 93A § 9, counsel for Ms. Maciel sent a demand letter to Defendants on October 22, 2010, which defined the injury, the relief sought, made reference to Mass. Gen. Laws ch. 93A, asserted that Defendants acted in an unfair or deceptive manner, referenced that Ms. Maciel anticipated a settlement within thirty days, and asserted that Ms. Maciel would pursue multiple damages and legal expenses should relief be denied.

## COUNT VI

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against BackRiver)

81.     Plaintiff Maciel repeats and realleges Paragraphs 1 through 67 of this Complaint.

82.     All contracts in Massachusetts include an implied covenant of good faith and fair dealing, which requires that neither party take any action that will deprive the other of the benefit of the contract.

83.     Ms. Maciel entered into a contract, the P&S, with BackRiver on June 29, 2009 in order to purchase Unit N21 at the Development.  BackRiver understood that the purpose of this contract was to facilitate the transfer of Unit N21 from Defendants to Ms. Maciel in exchange for payment.  The contract impliedly obligated BackRiver to reasonably cooperate in good faith with Ms. Maciel in the closing of her purchase of Unit N21.

84.     BackRiver failed to reasonably cooperate in good faith with Ms. Maciel by failing to provide complete and accurate information required by Bank of America to approve Ms. Maciel's loan and by refusing to grant even a one-day extension of the closing deadline, even though it had freely given multiple extensions to a similarly situated white purchaser.

85.     Defendants' conduct, including its failure to provide complete and accurate information to Bank of America and its refusal to grant any extension on the closing date, was intended to and did prevent Ms. Maciel from purchasing Unit N21.

## COUNT VII

### BREACH OF CONTRACT
### (Against BackRiver)

86.     Plaintiff Maciel repeats and realleges Paragraphs 1 through 67 of this Complaint.

87.     A written contract, the P&S, exists between Ms. Maciel and Defendant BackRiver.

88.     At all relevant times, Ms. Maciel performed or stood ready, willing, and able to perform her obligations under the P&S.

89.     BackRiver breached the P&S by, among other acts:

    a.   Failing to provide complete and accurate information to Bank of America; and

    b.   Refusing to grant even a one-day extension of the closing deadline.

90.    As a direct and proximate result of these and other breaches, Ms. Maciel has suffered and will continue to suffer substantial and irreparable injury.

## COUNT VIII

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against Hastings Inc., Hastings, Hastings Co., and BackRiver)**

91.    Plaintiff Maciel repeats and realleges Paragraphs 1 through 67 of this Complaint.

92.    Defendants Hastings Inc., Hastings, Hastings Co., and BackRiver intended the discriminatory conduct described above to cause, or should have known that it would case, emotional damage to Ms. Maciel.

93.    Hastings Inc., Hastings, Hastings Co., and BackRiver's conduct was extreme and outrageous because their discriminatory actions and conduct were beyond the bounds of decency and such discrimination is utterly intolerable in civilized community.

94.    Hastings Inc., Hastings, Hastings Co., and BackRiver's conduct caused Ms. Maciel distress.

95.    The distress that Hastings Inc., Hastings, Hastings Co., and BackRiver caused was severe and concrete, including, *inter alia*, anxiety, depression, lost sleep, and trauma, which required treatment by a mental health professional.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Donna Maciel requests that this Honorable Court grant the following relief:

1. Enjoin Defendants from engaging in further unfair and deceptive conduct, including discriminatory practices, and order Defendants to take part in an approved diversity training course;

2. After trial on the merits, enter of judgment against Defendants and in favor of Ms. Maciel for each violation alleged in this complaint; permanently enjoin and restrain Defendant from violating the Fair Housing Act, 42 U.S.C. § 3604 *et seq*.; 42 U.S.C. § 1982; the Massachusetts Equal Rights Act, Mass. Gen. Laws ch. 93, § 102; the Massachusetts Fair Housing Law, Mass. Gen. Laws ch. 151B, § 4; and the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A; and award such relief as this Court finds necessary to redress injury resulting from the Defendants' violations, including but not limited to:

   a. Compensatory damages pursuant to 42 U.S.C. § 3604; 42 U.S.C. § 1982, Mass. Gen. Laws ch. 93, § 102; Mass. Gen. Laws ch. 151B; and Mass. Gen. Laws ch. 93A, § 9;

   b. Punitive damages under 42 U.S.C. § 3604; 42 U.S.C. § 1982; Mass. Gen. Laws ch. 93, § 102; and Mass. Gen. Laws ch. 151B;

   c. Imposition of a $5000 civil penalty pursuant to Mass. Gen. Laws ch. 93A, § 4 for each violation of Mass. Gen. Laws ch. 93A § 2;

   d. Treble damages pursuant to Mass. Gen. Laws ch. 151B, § 9 and Mass. Gen. Laws ch. 93A, § 9;

   e. Attorneys' fees and costs pursuant to 42 U.S.C. § 3612; 42 U.S.C. § 1988(b); Mass. Gen. Laws ch. 93, § 102; Mass. Gen. Laws ch. 151B; and Mass. Gen. Laws ch. 93A, § 9;

    f.        Damages for emotional distress;

    g.        Damages for breach of contract and breach of the covenant of good faith and fair dealing; and

    h.        Any other exemplary and compensatory damages, fees, costs and equitable relief as this Court may determine to be just and proper.

## **JURY DEMAND**

Plaintiff Donna Maciel hereby requests this Court grant her a trial by a jury of her peers for the prosecution of her claims and determination of remedies as is allowed under the law.

Respectfully submitted,


/s/ Robert E. Toone
Robert E. Toone (BBO # 663249)
Catherine C. Deneke (BBO # 673871)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA  02210-2600
rtoone@foleyhoag.com
cdeneke@foleyhoag.com
(617) 832-1000


/s/ Michael Aleo
Michael Aleo (BBO # 672071)
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
OF THE BOSTON BAR
ASSOCIATION
294 Washington Street, Ste. 443
Boston, MA  02108
maleo@lawyerscom.org
(617) 988-0609


DATED:  December 15, 2010