UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
DONNA MACIEL                            )
                                        )
              Plaintiff,                )
                                        )          Civil Action No. 10-12167-JCB
v.                                      )
                                        )
THOMAS J. HASTINGS                      )
PROPERTIES, INC., et al.                )
                                        )
              Defendants.               )
_____)

<u>**ORDER ON MOTIONS FOR  SUMMARY JUDGMENT**</u>
(Docket Nos. 41, 44)

August 16, 2012

Boal, M.J.

**I.      Introduction**

On December 15, 2010, Plaintiff Donna Maciel ("Maciel") sued Defendants Thomas J.

Hastings Properties, Inc., Thomas Hastings, Michael Jones, Hastings Companies LLC, and Back

River Park LLC (collectively, "Defendants") in connection with her attempt to purchase an

affordable housing condominium at the Back River Townhomes development in Hingham,

Massachusetts.  (Docket No. 1).  Ms. Maciel alleges that Defendants violated the Fair Housing

Act, 42 U.S.C. §§ 3604, 3605 (Count I); 42 U.S.C. § 1982 (Count II); the Massachusetts Fair

Housing Law, Mass. Gen. Laws ch. 151B, § 4 (Count III); the Massachusetts Equal Rights Act,

Mass. Gen. Laws ch. 93, § 102 (Count IV); and the Massachusetts Consumer Protection Act,

Mass. Gen. Laws ch. 93A (Count V) when they discriminated against her on the basis of her race

and skin color.  Ms. Maciel also brings claims for breach of the covenant of good faith and fair

1

dealing and breach of contract against Back River Park LLC (Counts VI, VII) and intentional

infliction of emotional distress against Thomas J. Hastings Properties, Inc., Mr. Hastings,

Hastings Companies LLC, and Back River Park LLC (Count VIII).[1]

Ms. Maciel has moved for summary judgment with respect to her contract claims against

Back River Park LLC.  (Docket No. 44).  Defendants have moved for summary judgment with

respect to all of Ms. Maciel's claims.  (Docket No. 41).  For the reasons stated below, the Court

denies both motions for summary judgment.

**II.      Factual Background[2]**

A.     <u>The Parties</u>

Back River Townhomes is a development in Hingham, Massachusetts (the

"Development").  DO 1.  Ms. Maciel participated in an affordable housing lottery for the

opportunity to purchase a unit at the Development for a price below market rate.  DO 1; DFO 12.

 Ms. Maciel, who identifies herself as being of South Asian/Indian descent, speaks with a British

accent and has dark skin.  DFO 11.  She has two daughters who are of Asian, African-American,

and Puerto Rican descent.  <u>Id.</u>

Back River Park LLC ("Back River") contracts with purchasers for the sale of

---

[1] On April 26, 2011, all parties consented to the jurisdiction of a United States Magistrate Judge for all purposes.  (Docket No. 24).

[2] The facts are derived from the paragraphs contained in the parties' statements of material facts and the opposing parties' responses.  <u>See</u> Plaintiff's Response to Defendants' Statement of Undisputed Facts and Statement of Additional Material Facts ("PO") (Docket No. 49); Defendants' Opposition to Plaintiff's Statement of Undisputed Material Facts ("DO") (Docket No. 51); Defendants' Opposition to Plaintiff's Statement of Additional Material Facts ("DFO") (Docket No. 56).  The parties' statements of material facts are extensive, and include approximately 242 exhibits.

townhomes in the Development.  DO 2.  Thomas J. Hastings is the manager and sole owner of

Back River and is the sole owner, president and treasurer of defendant company Thomas J.

Hastings Properties, Inc.  DO 3; DFO 4.  Defendant Hastings Companies LLC is solely owned

by Mr. Hastings.  DFO 5.  At the time of the events at issue, Defendant Mike Jones was an

employee of Thomas J. Hastings Properties, Inc., see DFO 4, Susanne Eaton was an employee of

Thomas J. Hastings Properties, Inc. and acted on behalf of Hastings Companies LLC, Thomas J.

Hastings Properties, Inc., and Back River, see DFO 5, and Christina Payne was employed as a

real estate sales associate by Back River, see DFO 6.

     B.     The Development

The Development consists of luxury condominiums in Hingham, Massachusetts.  DFO

13.  The website for Hastings Companies describes the Development as "Hingham's Most

Prestigious Townhome community."  Id.  The Development's website features only pictures of

white people who appear to be wealthy.  Id.

Pursuant to an agreement with the town of Hingham, the Development was required to

contain five affordable housing units.  DO 14.  Two affordable housing units were available for

purchase at the Development in 2009: Unit D4 and Unit N21.[3]  DO 15; DFO 42.  The

Development was and is a phased development, meaning that construction was done in stages,

on certain buildings at a time, rather than all at one time.  DO 16.  Units D4 and N21 were

included in the first three subject phases of the development.  DO 17.

---

[3] The parties dispute the relative difference in each unit's amenities, location, noise level,
and proximity to the leasing office.  Specifically, Ms. Maciel contends that D4 is more desirable
because it has a tiled and walk out basement, more square footage, is more centrally located, and
is next to Mr. Jones' office.  PO 79-82; DFO 53-54.

C.     Ms. Maciel Visits The Development

On or about March 29, 2009, Ms. Maciel visited the Development with her two children to view a unit.  DFO 20.  The parties dispute what occurred during Ms. Maciel's visit.  Ms. Maciel asserts that Ms. Payne approached Ms. Maciel and immediately announced that the unit cost $1.2 million.  DFO 22, 23.  Ms. Maciel interpreted this statement to imply that the Development was beyond her price range.  DFO 22, 23.  Ms. Maciel also asserts that Ms. Payne told her that Hingham was a "predominantly white town" and questioned whether her family would "feel comfortable" living there.  DFO 24.  After meeting Ms. Maciel, Ms. Payne made an entry in a document titled "Notes Log for Donna Maciel" that stated: "Have a feeling she was seeking info on affordables, although she acted like Mrs. Astor."  DFO 26; D. Ex. 128.

Defendants deny that Ms. Payne made these statements.  Id.  Defendants state that Ms. Payne told Ms. Maciel to "look around" when she first arrived, and that Ms. Payne did not believe that Ms. Maciel lacked the means to purchase a non-affordable housing unit.  Id. at 22. Although Defendants admit that Ms. Payne told Ms. Maciel the she may prefer to live at a different development in Hingham, they argue that this was because the other development was a better fit for her and her children because the other development was "upscale," "very young," and "more alive" and that it is common for brokers to discuss different housing options.  PO 94; DFO 25.  Ms. Payne testified at her deposition that she did not recall making the entry described above in the Notes Log.  DFO 26.

D.     The Housing Lottery

The Massachusetts Department of Housing and Community Development ("DHCD") monitors the sale of the affordable housing units at the Development.  DO 6; DFO 8.  Brian

4

Engler is an employee of Stockard, Engler & Brigham or SEB, LLC ("SEB"), who administered the affordable housing lottery for the Development. DO 7; DFO 9. Mr. Engler's role was, in part, to assist the affordable housing buyer in closing on the sale. DO 8.

Mr. Engler conducted a housing lottery for the Development in May 2009. There were two separate lists in the affordable housing lottery: Unit Selection List #1 (also referred to as the "Local Preference List") and Unit Selection List #2 (also referred to as the "All Applicants List"). DFO 15. Lottery participants who were current residents of Hingham, past residents of Hingham, or currently employed by the Town of Hingham and working at least 20 hours a week were eligible for the Local Preference List. DFO 16. The other applicants were not. Id. at 16; DFO 17.[4] Three of the five total affordable housing units at the Development were reserved for applicants on the Local Preference List. DFO 18. Everyone listed on the Local Preference List was also listed on the All Applicants List, meaning that they were eligible for all five units while those on the All Applicants List were only eligible for two of the units. DFO 19.

---

[4] Because the number of minority candidates in the Local Preference pool "was less than the percentage of minorities in the surrounding HUD (U.S. Department of Housing and Urban Development) defined area," Defendants held a preliminary lottery of all minority applicants who did not qualify for the Local Preference pool. DFO 17. Minority applicants were then added to the Local Preference pool until the percentage of minority applicants in the local preference pool was equal to the percentage of minorities in the surrounding HUD-defined area. Id. Originally, there was only one minority applicant in the Local Preference pool. Id. A lottery was conducted and one additional applicant, but not Ms. Maciel, was added to the Local Preference List. Id.

When the lottery was initially conducted, Applicant No. 2 was at the top of both Unit Selection Lists (the Local Preference List and the All Applicants List).  DFO 44.  Applicant No. 2 went "on the clock"[5] on the Local Preference List and Applicant No. 8 (Sarah Gaut) moved up to the first position on the All Applicants List.  Id.  Applicant No. 2 was given the opportunity to sign a P&S for Unit N21 and Applicant No. 8 was given the opportunity to sign a P&S for Unit D4.  Id.  When Applicant No. 2 declined to execute a P&S for Unit N21, the next applicant on the Local Preference List, Applicant No. 6 (Kristyn Soule), was given an opportunity to sign a P&S for Unit N21.  DFO 45.  At this point, Ms. Soule was on the top of the Local Preference List and Ms. Gaut was on the top of the All Applicants List.  See Pl. Ex. BB.  Ms. Maciel was now second on the All Applicants list after Ms. Gaut.  Id.

On May 20, 2009, Mr. Engler emailed Mr. Hastings and Mr. Jones and suggested that Mr. Jones contact Ms. Maciel and "show her the unit [D4] just so she is immediately prepared if Gaut falls through."  DFO 29; Pl. Ex. 63.  On or about May 22, 2009, Mr. Jones called Ms. Maciel and invited her to visit the Development to look at an affordable housing unit.  DFO 31.  Mr. Jones was friendly with Ms. Maciel on the phone and advised her to be ready to sign a P&S as soon as one of the units became available.  DFO 33.  The phone call was the first time Mr. Jones spoke with Ms. Maciel.  DFO 32.  Mr. Jones testified at his deposition that he did not form a mental picture of Ms. Maciel when he spoke to her on the phone.  DFO 34.

---

[5]  According to the Development's affordable housing lottery information packet, when a household is notified that they are a top household on a unit selection list, they are "on the clock."  P. Ex. 86.  A household that is "on the clock" can choose to purchase any unit that is not under a Purchase and Sale Agreement ("P&S") and has 7 business days to sign a P&S for that unit.  Id.

On May 26, 2009, Ms. Maciel went to the Development for a viewing and met Mr. Jones in person for the first time.  DFO 35.  Ms. Maciel contends, and Defendants deny, that Mr. Jones was "visibly shocked" by her appearance.  DFO 36.  Mr. Jones showed Ms. Maciel both Unit D4 and Unit N21.  DFO 37.  Ms. Maciel informed Mr. Jones that she was interested in purchasing Unit D4.  DFO 38.  Mr. Jones told Ms. Maciel that it was unlikely that another unit would become available for Ms. Maciel because the applicant currently first on the All-Applicants List was very interested in the property.  DFO 39.

A few days later, Ms. Maciel called Mr. Jones to discuss the Development.  DFO 40. Ms. Maciel contends, and Defendants dispute, that Mr. Jones informed her that the woman who was first on the All Applicants List had signed a P&S for Unit D4 and another unit might not be available "for ten years" and might "never" be available if enough market rate units did not sell first.  DFO 40.  Ms. Maciel states that based on this conversation, she believed she would not be able to get an affordable housing unit at the Development and subsequently signed a P&S with a separate company for a housing unit in Kingston, Massachusetts.  DFO 41.

On June 16, 2009, Mr. Engler told Mr. Jones that Applicant No. 8 (Sarah Gaut) would not be able to move forward with the closing.  DFO 47.  Mr. Jones contacted Ms. Soule, who had already entered into a P&S for Unit N21, and offered her the opportunity to tour Unit D4 and switch the unit in her P&S, Unit N21, to Unit D4.  DFO 46, 49.  After Ms. Soule toured Unit D4, she decided that she preferred it to Unit N21, and on June 18, 2009 Defendants permitted Ms. Soule to amend her P&S to change the unit number.  DFO 52, 55.

Ms. Maciel maintains that she should have been able to purchase Unit D4 and that it was improper for Defendants to offer Ms. Soule the opportunity to switch from Unit N21 to D4.

DFO 48-51.  Ms. Maciel argues that because Ms. Gaut could not obtain financing, she should have advanced to Ms. Gaut's spot and been able to purchase D4, and that this was Mr. Engler's understanding as well.  DFO 48; PO 76.  Ms. Maciel also contends that other buyers were not allowed to switch units.  DFO 57; PO 76.  Defendants maintain that the "on the clock" letters do not specify which unit is available, and that Ms. Soule had a higher priority than Ms. Maciel because she was "on the clock" first.  DFO 49; PO 76.  Defendants further state that Unit D4 was to be finished before Unit N21, and that because Soule was "on the clock" first, she should be allowed to purchase the unit that would be completed first.  PO 76; DFO 49.  Defendants also state that Ms. Soule's situation was unique in that there was no other time where the opportunity to switch units arose.  DFO 57.

On June 18, 2009, Ms. Maciel was placed "on the clock" to sign a P&S.  DO 11.  The letter stated that Ms. Maciel had "until June 29, 2009" to sign the P&S and also stated that she had "7 business days" to sign the P&S.  PO 85; DFO 58; D. Ex. 27.  Mr. Jones interpreted this to mean that Ms. Maciel had until 12:00 a.m. on Monday, June 29 to sign the P&S, and he informed Ms. Maciel about this interpretation on Friday, June 26.  PO 86; DFO 61; DFO 68.  In response, Ms. Maciel informed Mr. Jones that Mr. Engler[6] had stated that she had until the end of the day on Monday, June 29, 2009.  DFO 69.[7]  Mr. Jones told Ms. Maciel that his phone would be on over the weekend.  DFO 71.  Ms. Maciel called Mr. Jones on Saturday, June 27.  Id.

---

[6]  In fact, Mr. Engler emailed Mr. Jones on Friday, June 26, stating that Ms. Maciel had until 5 p.m on June 29 to sign the P&S, to which Mr. Jones replied that he did not agree.  Pl. Ex. 68.

[7]  Ms. Maciel also contends that at that time she asked Mr. Jones for a copy of the P&S so she could review it over the weekend, but Mr. Jones refused to provide her with one.  DFO 70.

Mr. Jones left Ms. Maciel a message "asking her not to call [him] until Monday" morning.  Id. Defendants state that this was because Ms. Maciel called him multiple times.  DFO 71.  On Monday, June 29, 2009, Mr. Hastings emailed Ms. Maciel and stated she would remain on the clock until 5 p.m. that day.  PO 87.

As stated above, at the time Ms. Maciel was "on the clock" for N21, she had entered into a P&S with a development in Kingston.  At some point before June 26, 2009, Mr. Hastings asked Mr. Engler to speak with DHCD about whether this was an issue.  PO 40.  On June 26, 2009, Mr. Engler emailed Ms. Maciel and Mr. Jones, and stated that according to DHCD, Ms. Maciel needed to "prove to [Mr. Jones] that she [was] out of her P&S with the other development" and could not sign a P&S with Back River until this was done.  PO 37-39; DFO 76; D. Ex. 50.  On June 26, 2009 at 4 p.m., Mr. Jones told Ms. Maciel that she must provide Defendants with a written release from the Kingston development.  PO 37; DFO 77; DFO 83.  Ms. Maciel contends that a written release was not required and that Mr. Hastings was "looking for a reason" not to enter a P&S with her.  PO 37, 42; DFO 77.  Ms. Maciel argues that her offer to send a certified letter to the other developer terminating her P&S and her provision of email correspondence from the other developer showing that it had agreed to release her from her P&S should have been sufficient.  DFO 80, 81.

At 4:27 p.m. on Friday, June 26, 2009, Ms. Maciel sent an email to Mr. Engler and Mr. Jones that stated in part:

> I sincerely hope that [Mr. Jones] is not trying to block me from purchasing a unit because I am a minority.  Back River/Hingham is a white community and a family of color may make some residents uncomfortable.  I am sure that #8 was white and wasn't given a hard time for signing at the last minute.  If I am not given until the end of the day June 29th, I will lodge a complaint with the state and possibly under the race discrimination act.

PO 56; D. Ex. 133.

The next day, Ms. Maciel sent another email to Mr. Jones and Mr. Engler informing them that she is a member of a protected class under the Fair Housing Act and had been legally advised to document her communication with them.  PO 57; D. Ex. 134.

On Monday, June 29, 2009, Mr. Hastings directed Mr. Engler to cease communicating with Ms. Maciel and stated that all future communications with Ms. Maciel were to be with Mr. Hastings.  PO 58; DFO 75; D. Ex. 54; P. Ex. 13.  The parties dispute the reason for this.  PO 58. Defendants maintain that this was done in order to avoid future misunderstandings.  PO 58.  Ms. Maciel asserts that the purpose was to cut her off from Mr. Engler, who Ms. Maciel asserts was responsible for ensuring the Development's compliance with housing laws and supporting her during the affordable housing process.  PO 58, 59.

E.      The Parties Enter Into A P&S

On June 29, 2009,[8] Ms. Maciel and Back River entered into a P&S for Unit N21.  DO 12, 13; PO 1; D. Ex. 75; P. Ex. 13.  Ms. Maciel's lender was Bank of America.  DO 4.[9]  Section 7 of the P&S, "Time of Closing," stated that the closing date was to be "no later than September 4, 2009."  PO 1; D. Ex. 75.  The P&S provided that the closing date could be changed by the Seller. Id.  It also stated that "[i]t is agreed that time is of the essence of this Agreement."  Id.  Section 18 of the P&S, "Buyer Default," stated that if Ms. Maciel failed to fulfill the agreement, all deposits would be retained as liquidated damages.  Id.

---

[8]  Although the parties agree that the parties entered into the P&S on June 29, 2009, the document is dated June 18, 2009.  See D. Ex. 54; P. Ex. 13.

[9]  The parties dispute whether Defendants recommended BOA as a lender.  DO 5; PO 68.

F.      Communications Regarding The Closing Date

On July 27, 2009, Ms. Maciel emailed Mr. Hastings and requested that he move the closing date to August 27, 2009, so that she would not have to pay September rent.  PO 44; D Ex. 58.  Mr. Hastings responded that her unit would not be done on August 27, 2009, and that he would let her "know if we can make the closing date in your P&S - we may have to push that date back."  PO 45; D. Ex. 58.

On July 31, 2009, Mr. Hastings informed Ms. Maciel that the closing could occur on August 27, 2009.  PO 46; P. Ex. 35.  Ms. Maciel emailed Mr. Hastings and stated that based on Mr. Hastings' previous email, she had planned on a September closing and requested that the closing take place on September 3.  P. Ex. 35.  Mr. Hastings responded that August 27, 2009 remained the closing date.  P. Ex. 35.  Defendants assert that Mr. Hastings insisted on the August 27, 2009 closing date because "Donna Maciel and her lender and her attorneys needed to understand they needed to perform" their obligations under the P&S.  PO 49.  Ms. Maciel asserts that Mr. Hastings' insistence on the August 27, 2009 closing date was to prevent her from purchasing a home at Back River.  PO 49.

On August 11, 2009, Bank of America's closing attorney, Christopher Flammer, requested that Mr. Hastings move the closing back to the September 4, 2009 date.  PO 48; D. Ex. 101.  After receiving a phone call from DHCD, Mr. Hastings agreed to extend the closing date to September 4, 2009.  PO 50.

G.      The Condo Questionnaire

As a condition of providing Ms. Maciel with a mortgage for the purchase of Unit N21, Bank of America required that an authorized homeowner's association signatory complete and

execute a Condominium Homeowner's Association Certification ("Condo Questionnaire").  DO 18.  On August 12, 2009, Bank of America sent a blank Condo Questionnaire to Mr. Hastings to be completed for Ms. Maciel's unit.  DO 26.  The Condo Questionnaire asked for information regarding the number of units, the number of completed units, the number of units sold, and "common elements" in the Development.  DO 19; P. Ex. T.

The Condo Questionnaire allowed Bank of America to determine whether the Development satisfied Fannie Mae's eligibility requirements for new condominiums.  DO 22. Specifically, Fannie Mae's condominium acceptance guidelines required that at least 70 percent of the total units in the project or subject legal phase must have been conveyed or be under a bona fide contract for purchase as a principal residence or to a second home purchaser.  P. Ex. U. Fannie Mae defined "completion" of a project/subject legal phase as when "[t]he units, common areas and facilities associated with the project/subject legal phase" were complete.  P. Ex. V

The parties dispute whether the Development met these eligibility requirements at the time of Ms. Maciel's attempted purchase.  DO 24-25.  Ms. Maciel contends that Mr. Hastings had previously represented to Mr. Enger and on Condo Questionnaires for other affordable housing buyers that the Development had completed three phases and was 78% sold.  DO 24-25. Defendants argue that when Mr. Hastings had stated that the three phases were "complete" it was in the sense that the phases were filed in the registry of deeds and not "complete" in the literal sense.  DO 24-25.  Defendants further argue that Mr. Hastings calculated the 70% threshold requirement differently than Bank of America.  DO 24-25.

The parties also dispute whether Defendants accurately completed the Condo Questionnaire.  On August 14, 2009, Suzanne Eaton sent the signed Condo Questionnaire to

Bank of America.  DO 42; PO 25; D. Ex. 106.  Eaton had never completed a condo questionnaire before and testified that she did not understand the questions regarding the subject phases.  DO 30, 32.  On August 14, 2009, Ms. Eaton notified Mr. Hastings that a draft of the Condo Questionnaire was in his drafts folder for him to review.  DO 39.  Ms. Eaton did not make any revisions after Mr. Hastings reviewed the Condo Questionnaire, and Mr. Hastings sent the signed Condo Questionnaire to Bank of America only five minutes after Ms. Eaton placed it in his drafts folder.  DO 40-42.

In response to the Condo Questionnaire, Ms. Eaton did not identify the subject phase for Unit N21 and did not fill in a blank for "Subject Phase #".  DO 33; D. Ex. 106.  In response to the Question No. 4, Ms. Eaton answered "Yes" to the question "Is the Project a legally phased project?", but provided no response to the following question: "If YES, please list the Phase numbers and the number of units in each phase."  DO 34.[10]  In response to Questions No. 3 and 5, Ms. Eaton stated that the total number of units in the Development was 45 and that 22 units in the Development had been sold as primary residences or secondary residences.  DO 35, D. Ex. 106.  In response to Question 7, Ms. Eaton did not provide any response to the request for the number of units that had been sold as primary residences or second homes by "subject phase."  DO 36.  In response to Question No. 5, Ms. Eaton answered "No" to both of the following questions: "Are all units, common elements and amenities in the Project complete?" and "If NO, are all units, common elements and amenities in the Subject Phase complete?"  DO 37.[11]

_____

[10]  Defendants argue that this information was publicly available at the registry of deeds. DO 34.

[11]  The parties dispute whether Ms. Eaton knew or was unsure as to whether the common elements or amenities were complete.  DO 38.  Ms. Maciel notes that Defendants answered

     H.     <u>Events Of September 2, 2009</u>

On September 2, 2009, Back River's closing attorney, Mark Kablack, sent Ms. Maciel a letter stating that the closing had been set for September 4, 2009 at 10:00 a.m.  PO 6; D Ex. 91. The letter stated that Back River was "unwilling to grant any further extensions under th[e] [P&S].  Failure to close on the above-captioned unit on the appointed date, time and location . . . shall be considered a default under the [P&S]."  D. Ex. 91.

     I.     <u>Events Of September 3, 2009</u>

On September 3, 2009 at 3:35 p.m., Mr. Engler wrote to Mr. Hastings and stated that a representative of DHCD had called him about Ms. Maciel.  DO 79; P. Ex. JJ.  According to Mr. Engler, DHCD stated they "strongly, strongly recommended that (you) need to extend the deadline for the closing."  <u>Id.</u>

On September 3, 2009 at 3:36 p.m., Ms. Maciel emailed Mr. Hastings to request that the closing deadline be extended to the afternoon of September 4, 2009.  DO 80; P. Ex. KK.  She offered to "pay a charge to cover expenses incurred by the seller" if he would extend the deadline to the next business day.  <u>Id</u>.

On September 3, 2009 at 4:08 p.m., Adedayo Webb of Bank of America emailed Adilia Molina, also of Bank of America, regarding Ms. Maciel's mortgage.  P. Ex. EE.  The email stated: "NEITHER PROJECT AS A WHOLE OR SUBJ. PHASE IS COMPLETE PER HOA CERT. [the Condo Questionnaire] AND PRESALE/OWNER OCCUPANCY DOES NOT [MEET] REQUIREMENTS - BOTH CURRENTLY AT 48%."  DO 70; P. Ex. EE.

---

"Yes" to a similar question on Ms. Soule's and Ms. Ng's Citizen's Bank questionnaires ("Are all common areas/recreational facilities 100% complete?").  DO 51, 58; P. Ex. W, CC.

At 4:20 p.m., Ms. Molina responded to Mr. Webb, stating:

Appraisal report and HOA cert presented reflect contradicting info.

In add' the HOA cert does not indicate what phase subject unit is located in and whether that phase is complete etc.

Perhaps you'd want the HOA cert to be updated to include all information.  Since we are able to review based on legal phase completion of course would also need to meet presale and owner occupancy requirements per [Policies and Procedures Guide].

DO 71; P. Ex. EE.  Mr. Webb then forwarded this email to Ms. Maciel.  P. Ex. EE.

On September 3, 2009 at 4:30 p.m., Mark Coleman of Bank of America contacted Mr. Kablack seeking clarification regarding the number of phased units in the Development.  PO 27; D Ex. 115 (Affidavit of Mark Kablak).  At 5:33 p.m., Mr. Kablack sent Bank of America a revised first page of the Condo Questionnaire.  DO 44; PO 28; P Ex. 18; D. Ex. 108, 115 (September 30, 2009 Kablak Affidavit).

Mr. Kablack wrote on this revised first page "Updated as of 9/3/09 " and signed his initials followed by "Atty for Back River Park LLC."  DO 44, 45; D. Ex. 108.  On this revised first page of the Condo Questionnaire, Mr. Kablack changed the total number of units completed in the project from 23 to 26.  DO 45.  Mr. Kablack also provided the phase numbers and the number of units in each phase.  DO 46.

Mr. Kablack did not make any other changes to the Condo Questionnaire.  DO 47. Specifically, Attorney Kablack did not (1) identify the subject phase for Unit N21 or fill in the blank for "Subject Phase #"; (2) provide any response to Question No. 7 regarding the number of units that had been sold as primary residences or second homes by "subject phase"; or (3) change either "No" answers to the parts of Question No. 5: "Are all units, common elements and amenities in the Project complete?" and "If NO, are all units, common elements and amenities in

the Subject Phase complete?"  DO 48.  Mr. Kablak waited in his office until 6:45 p.m. that

evening but did not receive any response from Bank of America.  PO 30.

On September 3, 2009 at 6:11 p.m., Mr. Flemmer, Bank of America's closing attorney,

emailed Bank of America employees seeking an update on the closing, stating: "In our

conversation with the seller's attorney, he said that the seller may consider granting an extension

as long as we can pinpoint a time by which we can close."  DO 81; D. Ex. 93.

J.       Events On Closing Date, September 4, 2009

On September 4, 2010 at 9 a.m., Mr. Flammer sent Mr. Kablak and Mr. Hastings an

email attaching an extension request for September 8, 2010.  PO 21; D. Ex. 94; DO 82-83.  The

email stated:

> Mark, in our conversation last night you indicated that the Seller would not entertain any
> request for an extension until we had a realistic expectation of a time and date for the
> closing.
>
> After speaking to the bank this morning, I know that they are working very hard to
> complete their processing today, and we may have a package ready by this afternoon.
> However, given the uncertainty of the situation, it appears that we will most likely be
> able to close and go on record Tuesday.
>
> I assure you that Donna's loan will be approved shortly, and so by agreeing to this
> extension, you will save yourself from having to find another buyer and repeat this
> process. Please know that I will keep you updated with regards to the bank's progress,
> and I kindly ask that you sign the extension.

DO 82; D. Ex. 94.

At 9:57 a.m. on September 4, 2009, Mr. Kablack emailed Mr. Flammer and wrote: "My

client has asked whether you would cover all carrying costs from today through Tuesday, if the

loan does not close on Tuesday."  DO 84; P. Ex. OO.  At 10:00 a.m. on September 4, 2009, Mr.

Flammer emailed Mr. Kablack, Mr. Hastings and others and wrote: "I will certainly ask Donna if

she will cover the carrying costs, but in order for her to make this decision, I think she would

need to know exactly what those carrying costs are to be. Could you please supply a per-diem

figure?" DO 85; Id.

 At 10:26 a.m. on September 4, 2009, Mr. Kablack responded and wrote:

 At this time, my associate, Marusia Melnyk, is at the Rockland Office of the Plymouth
Registry, attempting to conduct a closing on this unit as scheduled. We have been given
no firm assurances by the buyer's lender that it will be able to close on a date/time
certain, and how much of an extension will be required. We also have been given no
clear understanding from the lender as to why there has been a further funding/closing
delay. As you know, the closing was already rescheduled based upon previous assurances
by all that the buyer/lender would be prepared to close today. Under these circumstances,
my client has no choice but to proceed to hold this buyer in default.

DO 86; P. Ex. OO.

 At 10:37 a.m. on September 4, 2009, Mr. Flammer responded:

 At 9:57 this morning you wrote me asking if Donna will agree to a per-diem, and I asked
for the per-diem figure before she will agree, and I did not receive a response. I also sent
you my extension request and explanation, and I stated that the bank is doing its best to
have this prepared today and so we will close on Tuesday at the latest. I kindly request
that your client reconsiders finding the buyer in default, and accept my request for an
extension until Tuesday. Please let me know if we can close this on Tuesday, and please
forward me the per-diem charge you wish Donna to pay.

DO 87; P. Ex. OO.

 At 1:27 p.m. on September 4, 2009, Mr. Kablack emailed Ms. Maciel and others and

wrote: "Donna, Back River Park LLC is holding you in default under your Purchase Agreement,

for failure to close at the appointed date and time. . . . Under these circumstances, and from this

point forward, I ask that you cease communicating directly with this office or with my client.

You should communicate through your legal counsel." DO 89; P. Ex. PP.

 At 4 p.m on September 4, 2009, Mark Coleman of Bank of America contacted Mr.

Kablak and requested additional changes to the questionnaire. D. Ex. 115; Kablak Affidavit §

11; PO 32-35.  Regarding Question No. 3b, Mr. Coleman requested that Mr. Kablak provide the projected total number of phases and total number of units in each phase over a complete project build out.  Id.  Mr. Kablak responded that because the developer had the right under the Master Deed to phase in one or more units up to maximum number of units permitted by Special Permit, "there could be no firm prediction, because the developer could decide, based upon market conditions, not to have any more future phases or could decide that all limits could be phases in individually."  Id.

Mr. Coleman also asked Mr. Kablak to change the answer to Question No. 5, which asked whether all the units, common elements and amenities in the project where complete.  Id. Kablak responded that the units, common elements and amenities "were not necessarily complete."  Id.

Mr. Coleman also requested that Mr. Kablak provide information in response to Question No. 7 regarding the subject phase for each unit that was sold or under contract.  D. Ex. 115; Kablak Aff. ¶¶ 11-12.  Mr. Kablak stated that he did not do so because the request was made after the scheduled closing date.  Id.; PO 35.

K.      Defendants Hold Ms. Maciel In Default

On September 8, 2009, Mr. Kablack wrote a letter to Ms. Maciel which stated: "This letter is meant to serve as a formal default notice under the Purchase and Sale Agreement dated June 18, 2009."  DO 91.  Back River retained Ms. Maciel's $2,553.00 deposit.  DO 92.

The parties do not dispute that as of September 8, 2010, Bank of America had not yet provided approval of Ms. Maciel's mortgage.  PO 23.

L.     Treatment Of Other Buyers

Ms. Maciel contends that Defendants treated Ms. Soule, a white affordable housing buyer, more favorably than Ms. Maciel in regards to her closing date.  On June 25, 2009, Defendants agreed to extend Ms. Soule's financing contingency deadline from June 26 to July 1.  PO 61; DO 97; DFO 138.  On July 7, Defendants again agreed to extend Ms. Soule's financing contingency deadline to July 13.  Id.

The parties dispute whether Defendants extended Soule's closing date.  Section 7 of Ms. Soule's P&S stated that closing date was to be "no later than August 25, 2009."  D. Ex. 18.  Ms. Maciel contends that Ms. Soule's closing dates were extended several times for the following reasons: (1) because her bank took too much time to process the necessary forms; (2) to accommodate her attorney's schedule; and (3) to allow her time to complete her bank's required first time homebuyer's class.  PO 67.  Defendants maintain that while the date for Ms. Soule's closing was changed, the outside closing date listed in Section 7 of her P&S - August 25, 2009 - never changed and Ms. Soule closed on her condo before that date.  DO 99, 100.

III.    Discussion

A.     Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  Sanchez v. Alvarad, 101 F.3d 223, 227 (1st Cir. 1996) (quotations and citations omitted).  A material fact is one which has "the potential

to affect the outcome of the suit under the applicable law." Id. (quotations and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. See id. at 324. "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. See O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). For those issues subject to cross-motions for summary judgment, the Court must consider each motion separately, drawing all inferences in favor of each non-moving party in turn. D&H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011). "[T]his does not mean that each motion must be considered in a vacuum. Where . . . cross-motions for summary judgment are filed simultaneously, or nearly so, the [] court ordinarily should consider the two motions at the same time, applying the same standards to each motion." Wells Real Estate Inv. Trust II, Inc. v. Chardon, 615 F.3d 45, 51 (1st Cir. 2010) (citation and internal quotation marks omitted). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

20

B.      Breach Of The Covenant Of Good Faith And Fair Dealing

The parties have both moved for summary judgment on Ms. Maciel's claim that
Defendants breached the covenant of good faith and fair dealing.  Ms. Maciel argues that Back
River (and its sole owner and manager Thomas Hastings) breached the covenant of good faith
and fair dealing by (1) providing false and incomplete information on the Condo Questionnaire;
and (2) refusing to grant Ms. Maciel a single business day's extension to the closing date listed
in the P&S.  Docket No. 46, p. 1.  Defendants claim they provided accurate information and
were within their rights to hold Ms. Maciel in default of the P&S.  Docket No. 41-2, p. 8.

Under Massachusetts law, "[e]very contract implies good faith and fair dealing between
the parties to it." T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 569-570 (Mass.
2010) (quoting Anthony's Pier Four, Inc. v. HBC Assoc., 411 Mass. 451, 471 (1991)).  "The
covenant of good faith and fair dealing requires that 'neither party shall do anything that will
have the effect of destroying or injuring the right of the other party to the fruits of the contract.'"
Id. at 570 (quoting Anthony's Pier Four, Inc., supra at 471-472).  However, the "scope of the
covenant is only as broad as the contract that governs the particular relationship." Id. (quoting
Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385 (2005)).  "It cannot 'create rights and
duties not otherwise provided for in the existing contractual relationship, as the purpose of the
covenant is to guarantee that the parties remain faithful to the intended and agreed expectations
of the parties in their performance.'" Id. (quoting Uno Restaurants, Inc. v. Boston Kenmore
Realty Corp., 441 Mass. 376, 385 (2004)).

This Court must "look to the party's manner of performance" in determining whether a
party violated the implied covenant of good faith and fair dealing.  Id.  "There is no requirement

that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith."  Id.

(citing Nile v. Nile, 432 Mass. 390, 398-399 (2000); 23 S. Williston, Contracts § 63.22, at 507

®. Lord 4th ed. 2002)).  "The lack of good faith can be inferred from the totality of the

circumstances."  Id.

The Court finds that there are genuine issues of material fact regarding whether

Defendants breached the covenant of good faith and fair dealing.  The parties hotly contest

whether Defendants'[12] answers to the Condo Questionnaire prevented Ms. Maciel from obtaining

her mortgage and subsequently defaulting on her P&S.  Both parties rely on the September 3,

2009 email exchange between Adedayo Webb and Adilia Molina of Bank of America, Ex. EE,

regarding Ms. Maciel's loan as support for their relative positions.  Neither party has presented

evidence from Bank of America explaining its decision.  Although Ms. Maciel attaches the

affidavit of Maryruth Ryan, a Bank of America supervisor, that affidavit does not indicate that

Ms. Ryan was involved in Ms. Maciel's loan – it merely states, in the most general of terms, that

a blank entry on the Condominium Questionnaire would have prevented Bank of America from

approving a loan.  See Ex. G.

There also exists a genuine issue of material fact as to the reasons why Defendants

answered the Condo Questionnaire as they did, specifically whether Defendants' interpretation

of Question No. 5 regarding the completeness of the amenities is plausible in light of their

responses to a similar question on Ms. Soule's and Ms. Ng's questionnaires.  In addition, the

---

[12] The Condominium Questionnaire was submitted by the Back River Condominium Trust, which is not a named defendant in this action.  Defendants argue in their opposition to Ms. Maciel's motion that there is a genuine issue of material fact regarding whether Defendant could be held responsible for the actions of the Trust.  Docket No. 52, p. 14.

parties dispute what Ms. Eaton did or did not know at the time she completed the Condo

Questionnaire, and whether Mr. Kablak's reasons for not providing the specific clarifications

requested by Bank of America are feasible.  Accordingly, the parties' motions for summary

judgment on the breach of the covenant of good faith and fair dealing claim are denied.

      C.    <u>Housing Discrimination Claims</u>

      Ms. Maciel alleges that Defendants violated the Fair Housing Act ("FHA"), 42 U.S.C. §§

3604(a) - (d), 3605 (Count I); 42 U.S.C. § 1982 (Count II); the Massachusetts Fair Housing Law,

Mass. Gen. Laws ch. 151B, § 4 (Count III) and the Massachusetts Equal Rights Act, Mass. Gen.

Laws ch. 93, § 102 (Count IV) when they discriminated against her on the basis of her race and

skin color.  Defendants argue that they are entitled to summary judgment because Ms. Maciel:

(1) cannot establish a prima facie case as she was not qualified to purchase the condominium;

and (2) has not established that Defendants' legitimate, non-discriminatory reasons for their

actions were pretextual.  Docket No. 41-2, p. 1, 5.

      1.    <u>Federal Claims</u>

      Section 3604(a) of the Fair Housing Act makes it unlawful to "refuse to sell . . . after the

making of a bona fide offer, or to refuse to negotiate for the sale . . . of, or otherwise make

unavailable or deny, a dwelling to any person because of race [or] color."  42 U.S.C. § 3604(a).

Section 3604(b) precludes discrimination "against any person in the terms, conditions, or

privileges of sale . . . of a dwelling . . . because of race [or] color." 42 U.S.C. § 3604(b).  Section

3604(c) makes it unlawful "to make, print, or publish, or cause to be made, printed, or published

any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that

indicates any preference, limitation, or discrimination based on race [or] color . . . or an intention

to make any such preference, limitation, or discrimination."  42 U.S.C. § 3604(c).  Section

3604(d) prohibits the "represent[ation] to any person because of race [or] color . . . that any

dwelling is not available for inspection, sale, or rental when such dwelling is in fact so

available."  42 U.S.C. § 3604(d).  Section 3605 of the FHA makes it unlawful "for any person or

other entity whose business includes engaging in residential real estate-related transactions to

discriminate against any person in making available such a transaction, or in the terms or

conditions of such a transaction, because of race [or] color."  42 U.S.C. § 3605(a).

Title 42, United States Code, Section 1982 provides that "[a]ll citizens of the United

States shall have the same right, in every State and Territory, as is enjoyed by white citizens

thereof to . . . purchase . . . real and personal property."

### 2. State Law Claims

Section 4(6) of Mass. Gen. Laws ch. 151B makes it unlawful for defendants to "refuse to

. . . sell or negotiate for sale or otherwise to deny to or withhold from any person . . . because of

the race . . . [or] color" and to "discriminate against any person because of [her] race [or] color."

Mass. Gen. Laws c. 151B §4(6)(a), (b).  The Massachusetts Equal Rights Act ("MERA"), Mass.

Gen. Laws ch. 93, § 102(a), guarantees every person in Massachusetts the same rights in the

purchase and sale of property regardless of race or color, to the extent that other Massachusetts

law does not already provide such protection.

### 3. Scope of Review

The parties assert that because the statutes at issue are substantially similar, this Court

may analyze Ms. Maciel's claims under federal law.  See Docket No. 41-2, p. 3; Docket No. 48,

p. 6 n. 4; see also McKenzie v. Brigham & Women's Hospital, 405 Mass. 432, 438 (Chapter 151

B and 42 U.S.C. § 1981[13] claims substantively identical); <u>College-Town, Division of Interco,</u>

<u>Inc. v. MDAC</u>, 400 Mass. 156, 163 (1987) (Massachusetts courts may look to, but are not bound

by, analogous federal statute in interpreting c. 151B); <u>Currier v. Nat'l Board of Medical</u>

<u>Examiners</u>, 462 Mass. 1, 14 (2012) (Massachusetts courts look to 42 U.S.C. § 1982 for guidance

in interpreting MERA).  Neither party has pointed to any differences in state and federal law that

might bear upon the outcome here.  Accordingly, the Court discusses the Chapter 151B and

MERA claims together with the federal claims.

4.     <u>Analysis Of FHA And Section 1982 Claims</u>

A plaintiff can show a violation of the FHA by showing either discriminatory intent or

discriminatory impact.  <u>Macone v. Town of Wakefield</u>, 277 F.3d 1, 5 (1st Cir. 2002).  However, a

claim under Section 1982 requires a showing of discriminatory intent.  <u>Fair Housing Justice</u>

<u>Center v. Edgewater Park Owners Cooperative</u>, No. 10-912, 2012 WL 762323, at * 7 (S.D.N.Y.

March 9, 2012).  The FHA does not require a plaintiff to show that discriminatory intent was the

sole factor in a defendant's conduct, but she must show that it was a substantial motivating factor

and provide a sufficient causal link between a defendant's discriminatory actions and her injury.

<u>Casa Marie, Inc. v. Superior Court of Puerto Rico</u>, 988 F.2d 252, 269 (1st Cir. 1993).

A plaintiff can show discriminatory intent either through direct or circumstantial

evidence, or by making a prima facie case of discrimination under the <u>McDonnell Douglas</u>

framework.  <u>South Middlesex Opportunity Counsel, Inc. v. Town of Framingham</u>, 752 F. Supp.

2d 85, 96 (D. Mass. 2010).  "'[B]right line articulations' distinguishing the direct evidence

---

[13]  Title 42, United States Code, Sections 1981 and 1982 have similar wording, a common
lineage, and are often construed in reference to the other.  <u>Ortiz-Rosario v. Toys R Us Puerto</u>
<u>Rico, Inc.</u>, 585 F. Supp. 2d 216, 220 (D.P.R. 2008)

approach the from <u>McDonnell Douglas</u> burden shifting analysis may not always be helpful" and

that "'the need for flexibility' sometimes justifies bypassing these approaches and instead

considering whether the 'totality of the evidence permits a finding of discrimination.'"   <u>Id.</u> at 97

(quoting <u>Dominguez-Cruz v. Suttle Carible, Inc.</u>, 202 F.3d 424, 429-30 (1ˢᵗ Cir. 2000)).   This

approach is particularly apt where, as here, Ms. Maciel has provided both direct and inferential

evidence of discrimination.   Accordingly, the Court will examine the totality of the evidence

with the guidance of the <u>McDonnell Douglas</u> framework.

     In order to make a case under the <u>McDonnell Douglas</u> framework, Ms. Maciel must

present evidence "'from which a jury could infer that the defendants' articulated reasons for the

challenged conduct were pretextual and that . . . discrimination was the real reason for the

adverse action."   <u>Id.</u> (quoting <u>Dominguez-Cruz</u>, 202 F.3d at 429).   First, she must "make a prima

facie case by providing evidence that gives rise to an inference of unlawful discrimination."   <u>Id.</u>

(citing <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253-54 (1981)).   The prima facie

showing is not an "onerous" burden, and can be "easily made."   <u>Id.</u> (citing <u>Kosereis v. Rhode

Island</u>, 331 F.3d 207, 213 (1st Cir. 2003)).   After Ms. Maciel makes her prima facie case, the

burden shifts to the Defendants to articulate a nondiscriminatory reason for the conduct.   <u>Id.</u>

After the Defendants rebut the presumption, Ms. Maciel has the burden of proof with respect to

the discriminatory intent of the conduct.   <u>Id</u>.   "At this stage, a court ruling on a summary

judgment motion must focus on whether, given the 'aggregate package of proof' and drawing all

inferences in the plaintiff's favor, there is a genuine issue of fact as to the discriminatory motive

of the conduct."   <u>Id.</u> (citing <u>Dominguz-Cruz</u>, 202 F.3d at 430-1).

Ms. Maciel asserts that the following evidence gives rise to an inference of unlawful discrimination: (1) Ms. Payne unlawfully steered Ms. Maciel away from the Development by immediately telling her the price of the condominium was $1.2 million, stated that Hingham was "predominantly white," questioned whether she and her family would "feel comfortable" living there, and suggested that she might prefer to live in a different development; (2) Mr. Jones, who was initially friendly with Ms. Maciel on the phone and told her to be ready to sign a P&S, was "visibly shocked" by her appearance and then told her another affordable unit might never be available or might not be available for ten years; (3) allowed Ms. Soule, a white woman, the opportunity to purchase Unit D4, which Ms. Maciel asserts is a better, more centrally located condominium, although Ms. Maciel was next in line; (4) attempted to prevent Ms. Maciel from signing a P&S by insisting she had to sign it by midnight on Sunday, June 28 and then prohibiting her from communicating with Mr. Jones until Monday; (5) insisting she obtain a written release from the Kingston development before allowing her to sign a P&S despite Ms. Maciel's provision of other documentation; (6) stopping Ms. Maciel from communicating with Mr. Engler; (7) initially stating that her condo would not be ready in August, suddenly changing the closing date to August, and then refusing to move it back to September until DHCD got involved; (8) providing false and incomplete information on the Condo Questionnaire despite providing correct and complete information for other affordable housing applicants; and (9) providing Ms. Soule numerous extensions to her closing date while refusing to do so for Ms. Maciel.

As detailed in the Court's recitation of the facts, Defendants have provided a legitimate reason for each of these actions.  The burden then shifts back to Ms. Maciel to establish that

these reasons are pretextual.  In order to do this, Ms. Maciel must also show that she was treated differently than a similarly situated individual at a similar time.  South Middlesex, 752 F. Supp. at 102.  In addition, "[w]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendants' actions can give rise to an inference of pretext.  Harrington v. Aggregate Industries-Northeast Region, Inc., 668 F.3d 25, 33 (1st Cir. Mass. 2012) (False Claims Act case) (internal quotation marks omitted).  "So can deviations from standard procedures, the sequence of occurrences leading up to a challenged decision, and close temporal proximity between relevant events."  Id.; see also Macone, 277 F.3d at 6 (procedural abnormalities can provide a basis for finding discriminatory intent).

The First Circuit has held that courts must be "particularly cautious" in granting a motion for summary judgment in instances where a plaintiff in a discrimination case makes out a prima facie case and the issue is whether the stated nondiscriminatory reason is a pretext.  See Hodgens v. General Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998) (Family Medical Leave Act case); Harrington, 668 F.3d at 33.  Although summary judgment is not "automatically precluded" in cases where discriminatory animus is at issue, a court should "use restraint" in granting summary judgment if a plaintiff has produced more than "conclusory allegations, improbable inferences, and unsupported speculation."  Hodgens, 144 F.3d at 167 (internal quotation marks and citations omitted).  The role of the Court is "not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  Id.

Viewing, as it must, the evidence in the light most favorable to Ms. Maciel, the Court finds that there is a genuine issue of material fact as to whether Defendants discriminated against Ms. Maciel and whether their stated reasons were pretextual.  The parties dispute Ms. Maciel's

28

direct evidence of discrimination, namely Ms. Payne's comments and Mr. Jones' reaction to Ms. Maciel's appearance.  The parties also contest the accuracy of the Condo Questionnaire, and neither side has provided evidence from the individuals at Bank of America who were actually involved in Ms. Maciel's loan.  In addition, there is a genuine issue of fact as to whether Defendants treated Ms. Maciel differently than Ms. Soule, specifically whether they departed from standard procedure in allowing Ms. Soule to have extensions to her closing date or allowing her to switch her unit to D4.  Accordingly, Defendants' motion for summary judgment regarding Ms. Maciel's housing discrimination claims is denied.

      D.      <u>Mass. Gen. Laws c. 93A And Intentional Infliction Of Emotional Distress Claims</u>

Ms. Maciel's complaint brings claims for violations of Mass. Gen. Laws c. 93A and intentional infliction of emotional distress.  Although they seek summary judgment on all of Ms. Maciel's claims, Defendants do not specifically address these claims, stating that such arguments would be duplicative of their arguments regarding Ms. Maciel's discrimination and contract claims.  Docket No. 54, p. 11-12.  Defendants make no effort to define the elements of these claims nor explain how their arguments regarding Ms. Maciel's discrimination and contract claims apply to these elements.  Because Defendants have not offered grounds for dismissing these claims, Defendants are not entitled to summary judgment on the Chapter 93A and intentional infliction of emotional distress claims.

## IV.     Conclusion

For the foregoing reasons, the motions for summary judgment are denied.


/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge